SHELDON C. BELL *et al.*, Plaintiffs and Counterdefendants-Appellants, *v.* YALE DEVELOPMENT COMPANY, Defendant and Counterplaintiff-Appellee.

Third District    No. 80-598

Opinion filed December 9, 1981.

Bruce L. Zumstein, of Codo, Bonds & Zumstein, P. C., of Joliet, for appellants.

Joseph M. Cernugel, of Cirricione, Block, Krockey & Cernugel, of Joliet, for appellee.

JUSTICE BARRY delivered the opinion of the court:
In 1973 Emerson Hacker and Anna Mae Hacker contracted to sell a

two-acre parcel of real estate in Bolingbrook, Illinois, to Yale Development Company, with the contract closing to be contingent upon Yale obtaining a rezoning of the property for its proposed use. Yale never completed performance of the contract, and in 1978 the Hackers entered into a contract with Sheldon Bell for sale of the same property. The Hackers assigned their interest in the Yale contract to Bell, and he filed suit to rescind the 1973 Hacker-Yale agreement. Yale counterclaimed for specific performance of the original contract. After Bell and Yale filed cross motions for summary judgment, thereby conceding that there were no questions of material fact in dispute, the trial court entered judgment for Yale and ordered specific performance of the original Hacker-Yale contract. This appeal followed.

Because the resolution of this dispute turns upon factual matters, it is necessary to explain the details of the dealings between the parties. The property involved in this case has approximately 208 feet of highway frontage and was improved with a single-family residence from which the Hackers had moved several years before they agreed to sell the property. Negotiations with Yale took place over an extended period, and finally, on July 31, 1973, they signed a contract which had been prepared for Yale, to sell the property for $150,000. The contract provided for an earnest money payment of $1,000, and closing was contingent upon the buyer obtaining "successful zoning of the subject property for the purchaser's use." The terms of the contract gave Yale 120 days to accomplish the rezoning, plus 60 additional days in the event an appeal should be necessary. The contract also provided that in the event the closing was not completed within seven months, the purchase price would be increased by $5,000.

On August 10, 1973, the Will County zoning officer denied Yale's application for rezoning the premises from farm use to B-2 commercial which would have permitted the use of the premises as a restaurant serving beer and alcoholic beverages. Yale, then, on November 10, 1973, appealed to the Will County Zoning Board of Appeals, and upon the zoning board's denial, Yale submitted its request to the Will County Board of Supervisors, where, on April 24, 1974, it was again denied. On July 16, 1974, Yale filed suit in the circuit court of Will County to challenge that action. In February of 1975 an additional complication to the zoning situation occurred when the village of Bolingbrook annexed the property in question. In February of 1976, Yale filed a *quo warranto* action to contest the annexation. That cause has yet to be tried, and according to the docket sheet appearing in the record, no activity has occurred since December 21, 1976.

Between June 11, 1974, and June 1, 1976, the Hackers called the Yale Development Company office a total of 39 times to check on the progress

of the rezoning application and to press for either closing or cancellation of the transaction. In addition there are six letters in the record from the Hackers to Yale, beginning in October of 1973, with a letter inquiring, "What's wrong?" and ending with a letter dated April 20, 1977, asking if Yale would like to cancel the contract. On January 30, 1976, the Hackers sent Yale a title policy commitment which Yale had requested. The record also contains 15 letters from Yale to the Hackers, almost all of which reassured the Hackers that a court hearing would be set "soon" or "in a few weeks." The correspondence also dealt with tax assessment matters, an arrangement to lease the house to the village of Bolingbrook, and the complication caused by the annexation of the parcel by the village while a zoning action was pending against the county.

The record also indicates that Yale began efforts to market the property for commercial use in November of 1976, which continued without success until April of 1977. In December of 1977, the zoning case had been placed upon the Will County jury list, but upon motion of Yale, the county's jury demand was stricken and the cause thereby removed from the ready trial list.

In August of 1978, the Hackers executed a contract selling the premises to Sheldon Bell for $150,000 cash, subject to Yale's interest. The Hackers also assigned Bell their interest in the Yale contract. According to Mrs. Hacker, she tried to call Yale's officers to notify them of the pending sale, but a secretary told her the men she was trying to reach did not want to talk to her anymore. The president of Yale denied that any agent of the company was ever instructed to say that he did not want to talk with the Hackers.

After the Hackers conveyed the property to Bell, he placed his interest in a land trust. On April 26, 1979, Bell gave Yale formal notice that Bell and the land trust had acquired the Hackers' rights to the property and that unless Yale waived the zoning contingency in its contract and completed performance within 30 days, Yale would be considered not to have proceeded with due diligence. Bell also advised Yale that he had a title commitment issued by Chicago Title Insurance Company which indicated proper evidence of marketable title. The letter went on:

> "We have met all of our obligations under the contract and are prepared to sit down with you and convey proper title upon your paying us the sum specified by the contract. However, if more than thirty (30) days lapse from the date of this letter without your indicating a date within the thirty (30) day period in which you agree to close the transaction we shall treat the contract as being rescinded due to your failure to meet a condition precedent to the consummation of the contract."

Yale responded with a letter dated May 7, 1979, saying that it believed it

had kept its rights alive under the Hacker contract, and with a second letter dated May 21 inquiring about some work that was being done on the premises. Bell did not answer either letter, and on May 25 Yale sent a letter informing Bell that Yale was ready to proceed with the closing without having the property rezoned and stating that "if you will comply with the obligations of the Seller under the contract, we shall be ready to close in due course." Bell did not regard any of the Yale letters as an appropriate response to his 30-day notice, and on June 7, 1979, he filed this action for rescission of the Hacker-Yale contract. Yale filed a counterclaim for specific performance, and the trial court entered summary judgment on behalf of Yale. Bell has appealed from that order.

Both parties virtually concede that the Hackers' conduct amounted to acquiescence in Yale's long delay in closing the transaction and that as a consequence, the Hackers waived their right to strict performance of the terms of the contract. Bell has argued in this court that Yale's conduct indicated an intent to abandon the contract. In view of the lengthy record of correspondence between Yale and the Hackers and between Yale and potential buyers of the property, we cannot say that an intent to abandon was clearly and unequivocally shown.

What is more significant, however, is the evidence of Bell's intention to rescind the contract if Yale did not complete performance within 30 days of Bell's letter. It has been held that, after delays in performance of a contract have been waived, the contract cannot be rescinded for failure to perform without giving the other party notice and a reasonable opportunity to perform. *Gamm Construction Co. v. Townsend* (1975), 32 Ill. App. 3d 848, 336 N.E.2d 592; *Schmahl v. Aurora National Bank* (1941), 311 Ill. App. 228, 35 N.E.2d 689.

This rule is much like the rule applying to forfeitures of real estate contracts: where the conduct of the vendor has amounted to a suspension of the right of forfeiture, such right can be resumed only by giving definite and specific notice of an intention to require performance of the contract within a reasonable time. (*Hockenbury v. Lorentz* (1976), 35 Ill. App. 3d 983, 343 N.E.2d 90.) With respect to the required notice in forfeiture cases it has been said:

> "The notice must be a reasonable one and a definite and specific notice of a changed intention. [Citations.] No comprehensive rule as to what constitutes a reasonable length of time to be given in a notice of such changed intention with reference to declaring a forfeiture of the contract can be laid down for the reason that each case is to be determined on its own particular facts. What is reasonable notice in one case may not be such in another." (*Forest Preserve Real Estate Improvement Corp. v. Miller* (1942), 379 Ill. 375, 382, 41 N.E.2d 526, 529.)

We believe the same is true of the notice of intent to rescind. In other words, to be effective the notice must contain a definite and specific intent to require full compliance with the terms of the contract within a reasonable time.

Bell's letter to Yale was certainly definite and specific. He requested that Yale pay the sum due within 30 days of the date of the letter, and stated that he had a title policy commitment so that he was prepared to convey "proper title." There is nothing in the record to indicate that Bell could not furnish merchantable title. As to whether 30 days for performance was a reasonable time, we think it clearly was. Six years had elapsed since Yale undertook to purchase this property. The parties quite obviously contemplated a closing within less than one year. Considering all the circumstances, we conclude that 30 days was reasonable.

Bell also contends that he has a right of forfeiture, but in fact his complaint sought rescission of the contract, not forfeiture, and he cannot upon appeal request a new remedy for the first time. Having elected the remedy of rescission, Bell is entitled to nothing greater, and must, of course, refund the earnest money of $1,000 to Yale.

In defense of the trial court's decision to deny Bell's request for rescission of the contract, Yale argues that Bell had to furnish a current title commitment before Yale would be obligated to pay the balance of the purchase price. According to the record, the Hackers had furnished a title policy to Yale when requested to do so in 1976, and furthermore, in his letter to Yale, Bell stated that he had a title commitment and he was ready to "convey proper title." Under these circumstances, we do not see that more was required.

We conclude that the judgment of the trial court must be reversed and this cause remanded for entry of a judgment rescinding the contract and refunding to Yale the $1,000 earnest money.

Reversed and remanded with directions.

ALLOY and HEIPLE, JJ., concur.