In re GREENFIELD DIRECT
RESPONSE, INC., Debtor.

GREENFIELD DIRECT RESPONSE,
INC., Plaintiff,

v.

ADCO LIST MANAGEMENT,
et al., Defendants.

GREENFIELD DIRECT RESPONSE,
INC., Plaintiff,

v.

ABBEY PRESS, et al., Defendants.

Bankruptcy No. 92 B 16100.
Adv. Nos. 93 A 00190, 93 A 00191.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 29, 1994.

Jay A. Frank, Thomas W. McPherson, Frank Miller Melamed Tabis & McDonnell, P.C., Chicago, IL, for Mastergrip, Inc.

Chester H. Foster, Jr., Foster Sorokas & Barton, Chicago, IL, for Greenfield Direct Response, Inc.

Stephen Sussman, Borker & Sussman, New York City.

Mark J. Rose, Chicago, IL.

Arnold H. Landis, Chicago, IL.

Gil Greenfield, Highland Park, IL.

Keevan Morgan, Durkin Morgan Roberts Barnett & Bly, Chicago, IL.

Jonathan Young, David J. Fischer, Wildman Harrold Allen & Dixon, Chicago, IL.

Elizabeth A. Ritvol, Brenda M. Cotter, Brown Rudnick Freed & Gesmer, Boston, MA, for Coburn Investments, Inc. d/b/a Golf Day.

J. Michael Williams, Ronald A. Damashek, Holleb & Coff, Chicago, IL, for Coburn Investments, Inc. d/b/a Golf Day.

Brian L. DeVeau, Rudnick & Wolfe, Chicago, IL.

Alan E. Gamza, Moses & Singer, New York City.

Malcolm McCluskey, President, List Services Corp., Bethel, CT.

Daniel S. Mathless, Law Office of Daniel S. Mathless, Thomas V. Askounis, Coston Lande & Sapir, Chicago, IL, for Names & Addresses, Inc., Rubin Response Services, Inc., Direct Media, Inc., Boardroom Reports, Inc., CompuName, Inc., Media Marketplace, Inc., Names in the News, Inc., Nat'l Demographics & Lifestyles, Inc., R.L. Polk & Co., and List Services Corp.

Gregory T. Diamond, Katz Randall & Weinberg, Chicago, IL.

Barbara Yong, Siegan Barbakoff, Chicago, IL.

Martin J. Jennings, Jr., Martinez & Jennings, West Trenton, NJ, for American List Counsel, Inc.

## MEMORANDUM OPINION

JACK B. SCHMETTERER, Bankruptcy Judge.

Each of the subject Adversary cases is related to and arose out of an involuntary petition for relief filed against debtor Greenfield Direct Response, Inc. ("GDR") on July 20, 1992. Originally under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. On September 3, 1992, each proceeding was converted to one under Chapter 11.

Among defendants to the two subject Adversary proceedings are Boardroom Reports Inc., Compuname, Inc., Direct Media, Inc., List Services Corp., Media Marketplace, Inc., Names and Addresses, Inc., Names in the News, Inc., National Demographics & Lifestyles, Inc., R.L. Polk, and Rubin Response Services, Inc. (collectively the "NAI Group").[1] These defendants moved in each of the captioned Adversary cases for Partial Summary Judgment. The following defendants have adopted the NAI Group's motions: American List Counsel, Hanover Direct, Inc., and Jordan Direct. The latter defendants, along with the NAI Group, are hereinafter referred to collectively as "Defendants." The plaintiffs in each case, Greenfield Direct Response ("GDR", or "Plaintiff", or "Debtor") and the First Midwest Bank of Buffalo Grove ("Bank"), also moved in each case for partial summary judgment. For reasons stated below, the motions of Defendants for Partial Summary are each allowed, and GDR's Motions for Summary Judgment (supported by the Bank) are each denied.

## UNDISPUTED FACTS

From filings by the parties pursuant to Fed.R.Bankr.P. 7056 and Local District Rule 12(M) and (N) (adopted as a Bankruptcy Court Rule in effect when these matters were briefed),[2] and the briefs, these facts emerge as undisputed:

At all times mentioned in the Complaints, GDR was a list broker in the business of providing mailing lists to purchasers of such lists, known in the industry as "mailers." Each mailer supplied the names of entities with specific purchaser characteristics that they wished to target. GDR searched its sources of "list owners" for a list owner who could satisfy the mailer's requirements. GDR then notified the list owner that a purchaser had been located for one of its mailing lists.

A contract defining each arrangement between the list owner, GDR, and the mailer was completed by GDR under its letterhead on a five copy form prepared by it. Upon execution, the first copy was sent to the list owner, the second copy to the mailer, and the remaining copies were kept by GDR. Delivery of the lists took place pursuant to the contract. GDR's compensation was set by a provision on the face of each contract, under the heading "List Owner—Read Carefully." That clause provided:

> GREENFIELD DIRECT RESPONSE, INC. acts only as agent for the list owner and does not guarantee payment under this order. Upon receipt of payment from the mailer who is solely responsible for payment of this order GREENFIELD DIRECT RESPONSE, INC. will remit to the list owner, less the standard 20% commission.

This provision ("collection clause") is the basis of the dispute in these Adversary cases.

The paramount issue in both Adversary complaints is whether payments made or owed to GDR from various mailers belong to GDR's bankruptcy estate or whether such payments belong to the list owners. In other words, did GDR collect the mailer's payments for itself pursuant to a contract between it and the mailer, or did it collect such payments as agent for the list owner?

In Adversary Complaint No. 93 A 00190 ("Declaratory" adversary), GDR seeks a declaration as to who, between itself and the list owners, has the rights to post-petition funds

---

**1.** The defendant, List Locators and Managers, Inc., was dismissed with prejudice as a party on July 29, 1994, on plaintiff's motion.

**2.** After the filings by each side, on July 11, 1994, the new Local Bankruptcy Rules took effect in this District. Local Bankruptcy Rule 402.M and N now incorporates the same summary judgment procedures and requirements as Local District Rule 12(M) and (N).

collected by GDR. Pursuant to a post-bankruptcy agreement between GDR and the NAI Group, these funds are now being held in a segregated bank account subject to this Court's further orders and pending resolution of the two proceedings. Ten Defendants described above as the NAI Group are list owners who claim an ownership interest in this account.[3] Each remaining Defendant had provided a mailer with a mailing list pursuant to the form contract prepared by GDR.

In Adversary Complaint No. 93 A 00191 ("Collection" adversary), GDR seeks recovery from certain mailers who have not remitted their payments to GDR for mailing lists received pursuant to the form contract with GDR. In addition, with respect to each payment, GDR seeks a declaration as to who, between itself and the list owners, is entitled to any funds that may be collected. Both GDR and the list owners believe that once this issue is decided, the majority of mailers will tender payment. Accordingly, the motions for summary judgment do not seek relief from the mailers and they are not parties to those motions. The remaining Defendants are parties to this Collection Adversary Complaint.

GDR is joined in its motions for summary judgment by the Bank.[4] In the last quarter of 1989, the Bank provided GDR a line of credit in the amount of $290,000.00. The Bank properly perfected its asserted security interest in GDR's accounts receivable and other assets. At no time prior to July, 1992, was the Bank aware of any competing ownership claims to GDR's accounts receivable.

GDR and the Bank seek a declaratory judgment that the funds that GDR has collected and is owed from the mailers belong to the bankruptcy estate. The Bank thereby seeks recognition of its claim of security interest in those funds. Defendants seek judgment that they are the true owners of the money, as GDR held the funds as their

agent. The case comes down to one issue to be decided: Who is the true owner of the funds, GDR or the defendants?

Additional undisputed facts are described in the discussion hereinbelow.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and General Rule 2.33 of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (B).

## STANDARDS FOR SUMMARY JUDGMENT

██ Under Fed.R.Civ.P. 56(c) (adopted by Fed.R.Bankr.P. 7056), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir.1990). Summary judgment is granted to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987). The burden is on the moving party to show that there is no such factual dispute. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56.

██ The party opposing the motion may not rest upon pleading allegations or denials; the response of that party must set forth in required filings specific facts showing that

---

**3.** Jordan Direct, List Locators and Managers, Inc., Names in the News, Inc., and R.L. Polk do not appear to claim an interest in these proceeds, and therefore they were not made parties and have not intervened.

**4.** The Bank was granted leave to intervene in Adversary No. 93 A 00191. The Bank filed its complaint, adopting paragraphs 1 through 397 of the Debtor's complaint. In addition, the Bank supplemented the Debtor's complaint with paragraphs 398 through 413.

there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2554; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 567 (7th Cir.1989); *Patrick v. Jasper County,* 901 F.2d 561, 564–66 (7th Cir. 1990).

■ On summary judgment motions, inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56; *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1302 (7th Cir.1991); *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991). However, a material factual dispute is sufficient to block judgment only if the disputed fact is determinative of the outcome under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Howland v. Kilquist,* 833 F.2d 639, 642 (7th Cir.1987).

■ The Court should not "weigh the evidence." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Illinois Bell Telephone Co. v. Haines and Company, Inc.,* 905 F.2d 1081, 1087 (7th Cir.1990). However, "[i]f evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–250, 106 S.Ct. at 2511; *Trautvetter v. Quick,* 916 F.2d at 1147. When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment should be granted. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

### Cross Motions for Summary Judgment

■ Although both parties argue for summary judgment, that does not by itself indicate that there are no genuine issues of material fact; the court must rule on each motion separately in determining whether each judgment may be entered in accordance with applicable principles. *ITT Indus. Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987) (Shadur, J.); *District 12, United Workers of Am. v. Peabody*

*Coal, Co.,* 602 F.Supp. 240, 242 (S.D.Ill.1985); *In re Woodstock Assoc. I, Inc.,* 120 B.R. 436, 442 (Bankr.N.D.Ill.1990). *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (2d ed. 1983 & Supp.1987). Cross-motions for summary judgment do not require the court to decide the case on those motions; the court can deny both motions if both parties have failed to meet the burden of establishing no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *ITT,* 674 F.Supp. at 1331; *Wolf v. Maryland Casualty,* 617 F.Supp. 456, 458 (S.D.Ill.1985). *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (2d ed. 1983 & Supp.1987).

### Partial Summary Judgment

■ Fed.R.Civ.P. 56(d) involves situations in which the motion does not lead to a judgment on the entire case but only terminates further contest on a portion of the litigation. Because Rule 56(d) is part of the rule entitled "Summary Judgment", the order prescribed by this rule has been referred to as "partial summary judgment." C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2737 (2d ed. 1983 & Supp.1987). However, partial summary judgment is not possible under federal pleading unless it disposes entirely of one or more counts of a complaint or counterclaim. *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216 (7th Cir.1946); *Capitol Records, Inc. v. Progress Record Distrib.,* 106 F.R.D. 25, 28 (N.D.Ill. 1985); *Triangle Ink & Color Co., Inc. v. Sherwin–Williams Co.,* 64 F.R.D. 536, 537–38 (N.D.Ill.1974).

### DISCUSSION

### I. *An Agency Relationship Existed Between GDR and the List Owners.*

This dispute essentially turns on interpretation of a single phrase of the collection clause in GDR's form contract. According to the NAI Group, the phrase, "GDR, Inc. acts only as agent for the list owner," provides conclusive evidence that GDR was its agent with respect to the contracts at issue. In response, GDR contends that at all times it

actually maintained a debtor-creditor relationship with the list owners. GDR asserts that evidence, of its conduct with the list owners and the understanding of parties when contracts were entered into, demonstrates that it was not an agent of the list owners. In addition, GDR contends that, because it was not subject to control of any list owner and commingled funds of the list owners, no agency relationship could have existed as a matter of law.

The parties agree that Illinois law governs the issues presented.

In Illinois, an agency is a consensual fiduciary relationship between two legal entities whereby the principal has the right to control the conduct of the agent and the agent has the power to effect the legal relations of the principal. *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 258 Ill.App.3d 588, 196 Ill.Dec. 775, 780–81, 630 N.E.2d 940, 945–46 (1st Dist.Ill.1994) (citations omitted). The usual tests of agency are whether the principal has authority to control the method or manner of accomplishing a task by the agent, and whether the agent has authority to subject the principal to liability. *Wargel v. First Nat'l Bank of Harrisburg*, 121 Ill.App.3d 730, 736, 77 Ill.Dec. 275, 280, 460 N.E.2d 331, 336 (5th Dist.1984). Although existence of an agency relationship is a question of fact, it may be inferred from facts of a particular case. *Lazarus v. Pascucci*, 74 Ill.App.3d 633, 640, 30 Ill.Dec. 727, 732, 393 N.E.2d 1074, 1079 (1st Dist.1979). However, where agency authority has been conferred in writing and there is no dispute concerning the parties' relationship, the question becomes one of law. *Regnery v. Regnery*, 211 Ill.App.3d 607, 613, 156 Ill.Dec. 81, 85, 570 N.E.2d 557, 561 (1st Dist.1991).

The word "agent" is broader than the word "broker" and more comprehensive in its legal scope; while every broker is in a sense an agent, every agent is not a broker. 1 Illinois Law and Practice Agency § 2 (West 1986), *citing DeGraw v. State Sec. Ins. Co.*, 40 Ill.App.3d 26, 32, 351 N.E.2d 302, 308 (1st Dist.1976). Attorneys, brokers, auctioneers, and similar persons employed for a single transaction are agents, although as to their physical activities they are independent contractors. *American Envtl., Inc. v. 3–J Co.*, 222 Ill.App.3d 242, 249, 164 Ill.Dec. 733, 739, 583 N.E.2d 649, 655 (2d Dist.1991).

GDR argues that, if it was an agent, it was the agent of the mailer. The language of its contract referred to the mailer as "our customer" in several places. However, even if it was an agent of the mailer, it is not inconsistent to find that GDR could have been a limited agent for both the mailer and the list owner as to different tasks and responsibilities. *Frank B. Hall*, 196 Ill.Dec. at 780–81, 630 N.E.2d at 945–46. In *Frank B. Hall*, an insurance broker, while primarily a broker for the insured, was also found to be an agent for the insurer for purposes of collecting and remitting premiums to the insurer. *Id.* The agreement there between the insurance company and the broker required the broker to perform the latter function. But this was a limited agency; upon remitting the premiums, the agency terminated. *Id.*

A similar agency was created in this case. In the heading of its form contract, GDR held itself out to be a broker. It thereby represented itself as an agent to someone. In the collection clause, GDR stated its duty, as agent for the list owners, to remit funds to the list owners upon receipt from the mailers. Accordingly, at a minimum, GDR was an agent of the list owner for purposes of collection and prompt remittance.

GDR maintains that evidence as to conduct of the parties under the contract and other extrinsic evidence will establish otherwise. However, extrinsic evidence is inadmissible to vary, alter, or contradict a written instrument which is complete, unambiguous, valid, and unaffected by fraud, duress, mistake, or illegality. *World Ins. Co. v. Smith*, 28 Ill.App.3d 1022, 1025, 329 N.E.2d 518, 520 (1st Dist.1975). Thus a complete and unambiguous written contract is presumed to include all material terms, and all prior negotiations are merged into that agreement. *Id.* Where there is no ambiguity, intentions of the parties should be ascertained from language of the contract, and the court should not consider extrinsic evidence

in determining such intent. *Id.* (citations omitted).

■ The contract in this case was unambiguous. The collection clause clearly stated that GDR, as agent for the list owner, must remit funds received from the mailers (less commission) to the list owner "upon receipt." Although an agent of the mailers, GDR was also an agent to the list owners for this limited purpose. There are no allegations by the parties here of fraud, duress, mistake, or illegality, and the document language in question is clear. Therefore, as the written contract terms were unambiguous, the offered evidence of circumstances and parol evidence would be inadmissible at trial to contradict these terms, and thus cannot block summary judgment.

■ GDR argues that since the dispute involves conduct of a party subsequent to the contract, parol evidence should nevertheless be admissible, referring to a recent Seventh Circuit opinion:

> It is always open to a party to a contract dispute to argue that while the contract may seem clear on its face, certain background facts show that its plain meaning is not its true meaning—that the parties couldn't have meant what they seem to have said, that they must have been using words in a special way. This is the doctrine of "extrinsic ambiguity," and although its reception by Illinois courts is not free from doubt, we have concluded that it is part of the law of Illinois.

*In re Stoecker*, 5 F.3d 1022, 1029–30 (7th Cir.1993).

In *Stoecker*, the parties disputed what was meant by use of the word "claim" in a settlement agreement. The court concluded that Bank's definition of "claim" was overly broad. When the agreement was signed, it was doubtful that either party even considered the Bank's definition of that term. *Id.* Therefore, the doctrine of "extrinsic ambiguity" was applicable. The case was remanded to the bankruptcy court with directions to consider extrinsic evidence when determining the definition of the word "claim" in the settlement agreement. In so holding, the court noted that the case before it was a "special" case. It noted that an improper application of the extrinsic ambiguity doctrine would deprive contracting parties generally of the protection they sought by reducing their agreement to writing. *Id.*

The instant case is not unusual and presents no "special" circumstances. The undisputed facts show no indication that the parties did not mean what they said or that the plain words used must or may have had "extrinsic ambiguity". To the contrary, GDR acknowledges that, in the collection clause, it designated itself as "agent" of the list owner so as to limit its liability and responsibility to the function of collection and remittance. *See* Affidavit of Gil Greenfield at ¶ 13.

Mr. Greenfield's Affidavit did not explain as to whom GDR was attempting to limit its liability. However, in the collection clause, GDR specifically stated that it was not responsible for the mailer's nonpayment for lists. Therefore, GDR could not have been using the word "agent" to limit its liability to the list owner. The apparent meaning of "agent" was its use with reference to GDR's duties of collection and prompt remittance so as to limit GDR's liability, as a representative of the list owner, to the mailer for the delivery of wrong or otherwise defective lists. GDR, as an agent of the list owner for liability purposes, cannot ignore its agency for one purpose and recognize it for another. *Rieger v. Brandt*, 329 Ill. 21, 28, 160 N.E. 130, 133 (1928), *Sams v. Rigg*, 339 Ill.App. 25, 32, 88 N.E.2d 673, 677 (3rd Dist.1949). As GDR has acknowledged and achieved the benefits of being an agent, it cannot escape the consequences of being an agent. *McAnelly v. Graves*, 126 Ill.App.3d 528, 81 Ill.Dec. 677, 680, 467 N.E.2d 377, 380 (5th Dist.1984).

Finally, GDR contends that certain additional "background facts" reveal that it was not in fact an agent of the list owner. These asserted facts are that GDR commingled funds that it received from the mailer; the lack of control by any alleged principal; and that the contract creating the agency were "boilerplate" language. However, these contentions do not comport with unambiguous terms of the contract nor with specified procedures of the parties pursuant thereto.

At a minimum, GDR was an agent of the list owner for the limited purpose of collecting payments from the mailers and for liability purposes. The collection clause specifically states GDR's duty to remit funds upon receipt. Therefore, there was nothing for the list owner to "control" except its supervision of the collection and remittance functions. In the context of this agreement, that was "control" enough to meet the test of agency under Illinois law.

Moreover, by commingling funds, GDR violated the terms of its contract to remit mailer payments to the list owners upon receipt. Indeed, allowing GDR to escape its agency because it commingled funds would reward GDR for its own conduct in breach of the contract.

Further, the very provision that contains the disputed language establishes the rate for GDR's compensation. GDR's offer to prove that its actual compensation varied from time-to-time from that provided in the contracts is inadequate to overcome the plain contract language limiting its liability and fixing its compensation.

Finally, we reach the contention that previously drafted language used in all contracts by a party is "boilerplate" and therefore to be minimized or even disregarded. To the extent there is legal basis for this argument, appearance of the disputed agency language on the face of each contract arranged by GDR overcomes any contention that such language was "boilerplate" having no weight.

Moreover, there is no evidence of a disparity in the relative bargaining power of the parties that sometimes gives rise to a "boilerplate" rule of law. *Williams v. Illinois State Scholarship Comm'n.*, 139 Ill.2d 24, 72, 150 Ill.Dec. 578, 600, 563 N.E.2d 465, 487 (1990) ("boilerplate" clause in a Graduate Student Loan contract given reduced significance because of the inequality of the parties bargaining power). Therefore, even if the language of the contract was "boilerplate" as commonly defined,[5] such language is binding on GDR and the NAI Group.

The GDR contract and the undisputed facts clearly establish that GDR was an agent for the list owner, at least for purposes of liability and collection. As parol evidence cannot contradict the terms of the written contract when such terms are unambiguous, any such evidence would be inadmissable.

## II. *The Proceeds Held by GDR as Agent Are Not Property of the Estate*

Having determined that GDR was an agent of the list owners, it must now be decided whether proceeds that it collected belong to GDR's bankruptcy estate or to the list owners. When determining whether funds are property of the estate, applicable state law applies. *Butner v. U.S.*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (Congress has left the determination of property rights in assets of the bankrupt to the states.) Under 11 U.S.C. § 541(d), property in which a debtor only has an equitable interest does not become property of the estate. Whether a debtor in possession of property has an equitable interest or any other interest is a question under state law. Once again, Illinois law determines this issue.

Under Illinois law, an agent does not own property transferred to it by or for the benefit of the principal. *Just Pants v. Bank of Ravenswood,* 136 Ill.App.3d 543, 547, 91 Ill.Dec. 49, 53, 483 N.E.2d 331, 335 (1st Dist.1985). An agent who collects money on behalf of the principal does not become the owner of such money. *Mulvihill v. White,* 89 Ill.App. 88, 91 (1899); *Kearney v. Webb,* 278 Ill. 17, 20–21, 115 N.E. 844, 845–6 (1917). Therefore, as GDR received or will receive the funds in question as agent for the list owners, it did not and will not become owner of those funds.

Bankruptcy authority comes to the same conclusion. Property held by a debtor as agent does not become property of the estate, as it belongs to someone else, usually the principal. 4 King, *Collier on Bankruptcy,* ¶ 541.08(2), p. 541–42 (15th ed.

---

**5.** Black's Law Dictionary (6th ed. 1990) defines "boilerplate" as language which is used commonly in documents having a definite meaning in the same context without variation; used to describe standard legal language that is identical in instruments of a like nature.

1993). Property held by a bankrupt in trust for another, where the bankrupt has no legal or equitable interest in such property, is not part of the bankruptcy estate. *In re Goldblatt Bros.*, 33 B.R. 1011, 1013 (N.D.Ill.1983), *appeal dismissed,* 758 F.2d 1248 (7th Cir. 1985).

As noted earlier, GDR argues that use of the word "agent" in the collection clause does not conclusively establish that it was agent for the list owner, and that the conduct of the parties under such contract should be examined. To support this position, GDR relies on a series of trust cases in which courts have set aside "in trust" language in agreements where alleged agents have commingled proceeds held for various principals. *See In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981); *In re Lord's, Inc.,* 356 F.2d 456 (7th Cir.1965), *cert. den. sub nom., Chicago Cutter–Karcher v. Maley,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); and *In re Schulman Transport Enterprises, Inc.,* 744 F.2d 293, 296 (2d Cir.1984). In each of these cases, the alleged agent was liable to the principal in the event a third party did not pay for goods or services. In addition, the alleged agent was entitled to keep the funds that it collected for a specified period of time before remitting them to the principal. Since these alleged agents were permitted to maintain some control over the funds, the respective courts found that the parties had a debtor-creditor relationship as opposed to a agent-principal or trustee-beneficiary one.

Unlike those trust cases, the collection clause in the instant case exempted GDR from liability in the event that a mailer did not pay. In addition, it required GDR to turn over funds received from its mailers upon receipt of those funds, less its commissions. The contract here did not require turnover at a specified settlement date, or on a monthly basis, or in a reasonable time, or at any other specified interval. Rather it provided for turnover upon receipt of funds by GDR. As a result, GDR's cited trust cases are distinguishable. Similarly, *In re Telesphere Communications, Inc.,* 167 B.R. 495 (Bankr.N.D.Ill.1994), may also be distinguished. Under facts somewhat similar to those before this Court, that opinion held that a debtor-creditor relationship existed between the parties as opposed to an agent-principal one. *Id.* However, the contract in *Telesphere* did not entitle the asserted "principals" to immediate payment; instead Telesphere remitted payment sixty days after month end. *Id.* at 503. Further, Telesphere was required to make its payments to the "principal" whether or not it received compensating payments from its customers. *Id.* at 505–6.

In its contract involved here, GDR specifically repudiated any liability to the list owners in the event that a mailer did not pay. In addition, as noted above, GDR was required to turnover funds received from a mailer upon receipt. Accordingly, despite some similarity in the facts, the holding in *Telesphere* does not apply to the facts presented here.

By holding the mailer's funds for several weeks, GDR violated the unambiguous terms of its contract. GDR argues that the list owners were well aware of this practice and did not object. The NAI Group denies such knowledge. However, that factual dispute does not present a critical issue that blocks summary judgment. Whether the list owners were aware of GDR's practice is irrelevant. As previously discussed, GDR, as an agent, had a fiduciary duty to turn over immediately funds received by it from the mailers. GDR's breach of its express contractual duty does not convert a principal-agent relationship to a debtor-creditor relationship.

Nor does commingling by an agent of its funds with those of a principal make the agent into an owner of the principal's money. *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612, 619 (1st Cir.1988). An agent entrusted with property for delivery to a principal or third party has only custody, not a right to possession or use of the property. *U.S. v. Galindo,* 871 F.2d 99, 101 (9th Cir.1989). Accordingly, property belonging to a principal that is in the hands of a bankruptcy debtor as agent may be recovered by the principal unless the principal has cloaked the agent with indicia of ownership so as to mislead a transferee, to

its detriment, into believing that the agent was true owner of the property. *In re Crouthamel Potato Chip Co. Inc.*, 6 B.R. 501, 509 (E.D.Pa.1980). However, the principal must do much more than entrust temporary possession to the agent in order for a transferee to claim that it was cloaked with apparent ownership. *Id.* at 509–510 n. 19. The self-initiated commingling of funds by GDR as an agent certainly did not cloak it with an apparent ownership interest in such funds.

Accordingly, the segregated account containing funds collected by GDR, and also all additional amounts owed by other mailers, belong to the list owners, subject to GDR's claim for commissions.

### III. *The Bank's Interest in the Segregated Account Is Not Superior to That of the NAI Group and Defendants.*

 The Bank's argument that GDR was not an agent for the list owners derives from the same and similar trust cases as those cited by GDR. For reasons discussed above, these cases are not applicable. Further, relying on the Affidavit of Kevin M. Cook (the bank loan officer responsible for the GDR account), it asserts that any competing claims to GDR's accounts receivable are inapplicable to it since it was unaware of such claims at the time it established a letter of credit for GDR. Affidavit of Kevin M. Cook, ¶ 9, 11. Therefore, it contends that its perfected security interest in the accounts receivable entitles it to be paid before the list owners. *Id.* at ¶ 8.

The Bank's argument has no merit. Certainly, while performing its due diligence, the Bank had ample and easy opportunity to become aware that GDR acted as a broker. It could not close its eyes to the contracts used by GDR and claim ignorance of those contracts. Hence, the Bank should have been aware that GDR was an agent for someone who might own the funds collected by GDR. Since it took a purported security interest in "receivables," it should have first ascertained whether GDR owned the supposed "receivables."

 Next, the Bank suggests that the list owners should have advised the Bank of their ownership interest in the accounts receivable before the Bank extended credit to GDR. This implies that the list owners were aware that GDR had pledged its accounts receivable as security for the Bank's letter of credit. In addition, this argument assumes that, to protect their ownership interest in the accounts receivable, the list owners had a duty to assert such ownership interest to the Bank.

Arguably, under *Crouthamel*, 6 B.R. 501, discussed above, the list owners under some circumstances might have had a duty to notify the Bank of their interest in the accounts receivable. For example, if the NAI Group had been aware that its agent was assigning its property as security and did not alert the Bank to their claims, then they might face a claim of laches against asserting a claim now with respect to such property. However, it has not been shown that the NAI Group had any knowledge of the nature of collateral pledged to the Bank by GDR until the affidavits were filed in this action. Consequently, the NAI Group did not have a duty to contact the Bank to assert claims. In performing its due diligence before issuing its letter of credit, the Bank could have, and should have, examined GDR's form contract. It is not unreasonable to hold the Bank to a duty to review the sole document, the GDR form contract, that its customer used to transact business. In this case, review of this document would have given the Bank notice that other parties may have had claims to ownership of GDR's supposed "accounts receivable."

The Bank has not asserted any facts entitling it to block summary judgment in favor of defendants. The list owners were not accused of misleading the Bank in any manner, or of even knowing that the Bank was seeking rights to their property. Therefore, except as to possible commissions owed to GDR, the Bank does not have a claim to the funds held in the segregated account of amounts received on behalf of the mailers.

### IV. *Partial Summary Judgment is Appropriate*

GDR and the Bank seek a declaratory judgment that the Funds which GDR is col-

lecting from the customers (the mailers) belong to the bankruptcy estate. Thus, once defendants' summary judgment motions are granted, all claims brought by GDR and the Bank in a number of counts will be disposed of. Defendants' motions seek relief as to the entirety of these counts brought by GDR and the Bank, and that relief will now be allowed. Since a number of counts will therefore be disposed of, "partial" summary judgment is allowed.

Under the Declaratory Judgment Act, this ruling granting defendants' summary judgment motion, although disposing of entire counts, will not dispose of the entire case. The NAI Group, in the form of an affirmative pleading, has sought further relief. Under 28 U.S.C. § 2202, further relief may be granted after a court declares the rights of the parties, without the need for a formal counterclaim:

(a) The NAI Group asserts that, if the funds on hand and allocable to the NAI Group are insufficient to make the NAI Group whole, then a trust should be impressed against the GDR to the extent necessary to make the NAI Group whole (and as a remedy for GDR's alleged breach of fiduciary duty in converting agency funds);

(b) The NAI Group also asserts that, if the funds on hand and traceable to the NAI Group are not sufficient to make the NAI Group whole, then GDR cannot receive its commission share until the NAI Group is made whole—as the contractual condition precedent for GDR to receive a commission does not vest until the NAI Group receives its full ownership share; and

(c) The NAI Group also asserts that, regardless of whether there are sufficient funds on hand and traceable to the NAI Group, GDR should forfeit its commission share back to the NAI Group.

But none of these affirmative claims for further relief (under 28 U.S.C. § 2202) is part of the summary judgment proceedings. Thus, as these claims are the equivalent of a counterclaim, their existence does not detract from the fact that a granting of defendants' summary judgment motion will complete adjudication of a number of the GDR and Bank counts in their entirety.

Defendants' motion for partial summary judgment does not seek adjudication of the NAI Group's affirmative claims. Thus, although the NAI Group prevails on its summary judgment motion and may thereafter pursue those affirmative claims, the entry of summary judgment will not preclude GDR or the Bank from then opposing those affirmative claims.

### CONCLUSION

For the foregoing reasons, motions of the Plaintiff and the Bank for summary judgment are by separate order each denied. The Defendants' motions for partial summary judgment are each allowed. Counsel for the NAI Group will be asked to submit proposed judgment orders in accord with this ruling. After the judgment orders are entered, further hearings with respect to issues such as GDR's claims for commission from funds collected and to be collected, and the NAI affirmative claims, will then be set.